UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ONEIDA NATION OF NEW YORK,

                             Plaintiff,

        -v-                                      6:10-CV-1071

DAVID A. PATERSON, JAMIE WOODWARD,
and WILLIAM J. COMISKEY,

                             Defendants.

NEW YORK ASSOCIATION OF CONVENIENCE
STORES, NEW YORK STATE ASSOCIATION
OF COUNTIES, AMERICAN CANCER SOCIETY,

                             Amici Curiae.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

ONEIDA NATION LEGAL DEPARTMENT        PETER D. CARMEN, ESQ.
Attorneys for Oneida Indian Nation    MEGHAN MURPHY BEAKMAN, ESQ.
5218 Patrick Road
Verona, NY 13478

ZUCKERMAN SPAEDER LLP                 MICHAEL R. SMITH, ESQ.
Attorneys for Oneida Indian Nation
1800 M. Street, N.W.
Washington, D.C. 20036

WILLIAMS & CONNOLLY LLP               DANIEL F. KATZ, ESQ.
Attorneys for Oneida Indian Nation    DENNIS M. BLACK, ESQ.
725 12th Street N.W.                  MICHAEL V. PINKEL, ESQ.
Washington, D.C. 20005                MATTHEW V. JOHNSON, ESQ.

HON. ANDREW M. CUOMO                  SENTA B. SUIDA, ESQ.
Attorney General for the State of New York   Ass't Attorney General
Attorney for Defendants
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204

The Capitol                                    DAVID B. ROBERTS, ESQ.
Albany, NY 12224                               Ass't Attorney General
                                               ANDREW D. BING, ESQ.
                                               Deputy Solicitor General


HARRIS BEACH PLLC                              RICHARD T. SULLIVAN, ESQ.
Attorneys for New York Association of
    Convenience Stores, Amicus curiae
726 Exchange Street Suite 1000
Buffalo, NY 14210

STEPHEN J. ACQUARIO, ESQ.                      ROBERT W. GIBBON, ESQ.
General Counsel for New York State Association  Ass't Counsel
    of Counties, Amicus Curiae
540 Broadway, 5th Floor
Albany, NY 12207

PATRICK J. MCKENNA, ESQ.
Attorney for American Cancer Society,
    Amicus Curiae
260 Osborne Road
Albany, NY 12211

DAVID N. HURD
United States District Judge

<u>MEMORANDUM-DECISION & ORDER</u>
and
<u>PRELIMINARY INJUNCTION</u>

## I. <u>INTRODUCTION</u>

On September 17, 2010, an Order to Show Cause and Temporary Restraining Order ("TRO") was issued.  Plaintiff Oneida Nation of New York's ("Oneida Nation") motion for a preliminary injunction was set down for a hearing on October 1, 2010.  The parties agreed that it would not be necessary to present evidence at the hearing.

Defendants cross moved to transfer and/or consolidate, and plaintiff moved to refer the action to mediation.  Defendants opposed plaintiff's motions, as did amici curiae New York Association of Convenience Stores and New York State Association of Counties.

Amicus curiae American Cancer Society opposed the Oneida Nation's motion for a preliminary injunction.  Plaintiff opposed defendants' motion to transfer and/or consolidate.

Oral argument was heard on October 1, 2010, in Utica, New York.  The TRO was extended until October 15, 2010.  Decision on the motions was reserved.  The following are findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## II.  BACKGROUND

It is well settled that a state cannot impose a tax upon cigarettes sold on a reservation to members of an Indian tribe ("member").  Dep't of Tax. & Fin. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 64, 114 S. Ct. 2028, 2030 (1994).  A state may impose a tax upon cigarettes sold on a reservation to non-members of the tribe ("non-member").  Id.

New York State ("New York" or "the State") has long had laws requiring collection of state taxes on cigarettes sold on reservations to non-members.  However, the State had a policy of forbearance, that is, it did not enforce taxation of on-reservation sales of cigarettes to non-members.  Following is a general, non-technical description of the regulatory scheme devised by New York in early 2010 following revocation of its forbearance policy.

On June 21, 2010, the State enacted amendments to its Tax Law ("the new law") to provide for taxation of cigarettes sold on a reservation to non-members, and the Governor signed it into law.   Under the new law, which was to become effective September 1, 2010, wholesalers and tax stamp agents (collectively "wholesalers") are required to tax stamp all cigarettes whether or not they are bound for on-reservation sales.  The wholesaler purchases stamps from the State at the rate of $4.35 for each pack of cigarettes, which amounts to $43.50 per carton.  The new law forbids wholesalers from selling any unstamped cigarettes.

Because a state cannot tax cigarettes sold on reservation to members, the new law provides that a tribe can opt in to a coupon system for obtaining tax free cigarettes for its members, or obtain such cigarettes from wholesalers who have prior approval from the State to sell a certain amount of tax exempt cigarettes to a particular tribe.

The new law directs that a "probable demand" of cigarette consumption by members and the tribe be calculated, as prescribed by regulation.  The new law also provides that specifics regarding prior approval would be prescribed by regulations.  An amendment passed on June 22, 2010, directed that within sixty days the tax department promulgate rules and regulations to fully implement the new law.  The tax department adopted an emergency rule, also on June 22, 2010, directing that probable demand for a tribe be calculated using, inter alia, census figures for the tribe and the nationwide average cigarette consumption per capita.  A tribe would be able to obtain the number of packs determined to be its probable demand[1] for tax-free sale to its members, by means of either the elective coupon system or with prior approval.  The emergency rule required tribes opting in to the coupon system do so by August 15.

The June 22, 2010, emergency rule described the exemption coupon system.  However, it did not provide specifics of the prior approval scheme.  Rather, it provided that "[t]he manner and form of prior approval will be determined by the department, and may include the use of an interactive Web application."  Carmen Aff. Ex. 5, Doc. No. 12-5, § 74.6(d)(3).

---

[1]  There is a method by which a tribe can challenge the probable demand figure.  The amount of the Oneida Nation's probable demand as calculated by the State is not at issue here.

On July 29, 2010, the tax department guidance division issued a technical memorandum ("July TSB-M") regarding the exemption coupon and prior approval schemes, as well as probable demand.  "A TSB-M is an informational statement explaining existing Department policies and/or outlining changes in the law, regulations, or Department policies." Smirlock Aff. ¶ 21, Doc. No. 46-5.

The July TSB-M set probable demand quotas for nine qualified Indian nations and tribes, including plaintiff.  The Oneida Nation's quota was set at 31,200 packs of tax-free cigarettes each quarter for quarters occurring September 1, 2010, to August 31, 2011. Carmen Aff. Ex. 7, Doc. No. 12-7.

If a tribe elected to participate in the exemption coupon scheme, the tax department would provide it with tax exemption coupons for an appropriate number of packs determined by probable demand.  The tribe (or cigarette sellers to whom the tribe distributed its coupons) could then purchase tax exempt cigarettes from wholesalers with the tax exemption coupons.  The wholesalers would then submit the coupons to the State to claim a refund of the appropriate amount.

The prior approval scheme requires wholesalers to obtain approval of a tax free sale before consummating such sale.  If the wholesaler does not obtain prior approval, it will be unable to recoup the amount it paid for tax stamps.  According to the July TSB-M, wholesalers wishing to make tax-free sales to Indian tribes are required to have an online services account on the tax department's website.  The tax department will post each tribe's quota at the beginning of each quarter.  A wholesaler may claim part or all of a tribe's quota of untaxed cigarettes.  The number of cigarettes claimed is automatically subtracted from the tribe's quota, and an authorization code is generated.  If there is no actual sale to a tribe

within 48 hours, the "claim" disappears.  However, the wholesaler may go back to the website and again claim the tribe's allotment of tax exempt cigarettes.  If the cigarettes are actually sold to a tribe, the wholesaler must report that on the website.  When the sale is reported, a confirmation number is issued to the wholesaler so that it can obtain a refund of the prepaid tax.  According to the July TSB-M specific instructions and updates will be provided on the tax department website.

The Oneida Nation did not opt in to the coupon system, so it must use the prior approval system to obtain tax free cigarettes for its members.

According to the Oneida Nation, it keeps in inventory 80,000 cartons in order to maintain its business.  The tax on this inventory amounts to about $3.5 million.  Further, the cost of borrowing the cash to pay the tax on cartons in inventory will be at least $208,000 per year.

Various State and federal law suits were filed challenging the new law on a variety of grounds.  Among them are Seneca Nation of Indians v. Paterson, No. 1:10-CV-687, and Unkechauge Indian Nation v. Paterson, No. 1:10-CV-711 ("Seneca & Cayuga[2] cases"), before Hon. Richard J. Arcara in the Western District of New York ("Western District"), and before Hon. Lawrence Kahn in the Northern District of New York ("Northern District"), St. Regis Mohawk Tribe v. Paterson, 8:10-CV-1026 ("St. Regis case").  Like this action, a TRO was issued in these three cases on motion of plaintiff.  A two-day hearing was held on plaintiffs' motion for a preliminary injunction in the Seneca & Cayuga cases, and decision

---

[2]  The Cayuga Indian Nation's motion to intervene in the case was granted in August 2010.

was reserved.  In those three cases, as in this case, the TROs were extended to October 15,

2010.  On October 7, 2010, the St. Regis case was transferred to the Western District.

## III.  <u>DISCUSSION</u>

### A.  <u>Defendants' Motion to Transfer or Consolidate</u>

A change of venue may be ordered, at the discretion of the court, "[f]or the

convenience of parties and witnesses, in the interest of justice," to any district where it might

have been brought.  28 U.S.C. § 1404(a); <u>Golconda Mining Corp. v. Herlands</u>, 365 F.2d 856,

857 (2d Cir. 1966); <u>Lappe v. American Honda Motor Co., Inc.</u>, 857 F. Supp. 222, 229

(N.D.N.Y. 1994), <u>aff'd</u>, 101 F.3d 682 (2d Cir. 1996).  A case may only be brought in:

> (1) a judicial district where any defendant resides, if all
> defendants reside in the same State;
> (2) a judicial district in which a substantial part of the events or omissions
> giving rise to the claim occurred, or a substantial part of property that is
> the subject of the action is situated; or
> (3) a judicial district in which any defendant may be found, if there is no
> district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).

In determining whether to transfer an action, the court must consider

> "[T]he convenience of the parties; the convenience of the witnesses; the
> relative ease of access to the sources of proof; the availability of the
> process to compel attendance of unwilling witnesses; the cost of
> obtaining willing witnesses; practical problems that make trial of a case
> easy, expeditious, and inexpensive; and the interest of justice."

<u>Lappe</u>, 857 F. Supp. at 229 (quoting <u>Aquatic Amusement Assocs., Ltd. v. Walt Disney World</u>

<u>Co.</u>, 734 F. Supp. 54, 56 (N.D.N.Y. 1990)).  Plaintiff's choice of forum is ordinarily given

deference, unless there is little connection between the forum and the operative facts.

<u>Lappe</u>, 857 F. Supp. at 229.  The moving party bears the heavy burden of establishing that

the motion to transfer should be granted.  Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 218 (2d Cir. 1978); Lappe, 857 F. Supp. at 229.

Defendants seek to transfer venue to the Western District.  Thus, it must be determined if that is a district in which this action "might have been brought."  See 28 U.S.C. § 1404(a).  Defendants first argue that they may be deemed to reside in the Western District because the tax department maintains offices there and conducts significant business there, including audits and investigations related to cigarette taxation, thereby appropriately placing venue pursuant to 28 U.S.C. § 1391(b)(1).  Defendants rely upon St. Regis Mohawk Tribe v. New York, 774 F. Supp. 185, 186 n.1 (S.D.N.Y. 1991) and Buffalo Teachers Federation, Inc. v. Helsby, 426 F. Supp. 828, 829-30 (S.D.N.Y. 1976) to establish their residency as state officials in the Western District.

Defendants' cited authority is unpersuasive for numerous reasons.  In St Regis, the court stated, in a footnote, that "the weight of authority is . . . that a state official may have more than one residence for venue purposes when she conducts a significant amount of business in both locations."  St. Regis, 774 F. Supp. at 186 n.1.  Even if that statement is accurate, which has not been determined, it was made in a footnote and provided no basis for the court's holding that venue should be transferred to the Northern District of New York.[3] Moreover, that a state official may have more than one residence for venue purposes (again, without making such a determination), is not helpful here for analyzing whether these defendants reside, for the purposes of venue, in the Western District.  Further, the case is

_____

[3]  In St. Regis, the state defendants argued that venue was improper in plaintiff's chosen forum, and the case should be transferred to the Northern District.

from a district court in another district and is not binding here.  Thus, St. Regis is not helpful to establish that venue is proper in the Western District.

Similarly, as case law from a district court in another district, Helsby is not binding in this case.  In Helsby, the state defendants argued, in diametric opposition to their argument in this case, that the only proper venue for the case was in the Northern District of New York, because their residence for venue purposes was in Albany, the site of the defendants' main office.  Helsby, 426 F. Supp. at 829.  The Helsby Court recited the general rule that for venue purposes a government official resides in the judicial district in which his official residence is maintained, that is, where he performs his official duties.  Id.  The court found that in the particular circumstances of the case, given that the state agency defendant maintained an official residence in the plaintiff's chosen forum, it was proper to find that venue lay in that district.  Id. at 830.[4]  Defendants have failed to establish reasons why the general rule should not apply in the circumstances of this case.  Moreover, neither party has cited binding authority under which this case could be excepted from the general rule.  Thus, as with St. Regis, Helsby does not support defendants' assertion that venue is proper in the Western District.

Defendants also argue that a substantial part of the events giving rise to the Oneida Nation's claim occurred in the Western District, making venue there proper under 28 U.S.C. § 1391(b)(2).  The defendants' single sentence of analysis on this point asserts that the Oneida Nation obtains some of its cigarettes from manufacturers and distributors that operate in the

---

[4]  The court proceeded to analyze the appropriate factors and denied the state defendant's motion to transfer venue.  Id.

Western District.  That two of the Oneida Nation's distributors operate in the Western District in no way establishes that a substantial part of events giving rise to this claim occurred there.

Defendants failed to establish that venue is proper in the Western District, thereby permitting transfer pursuant to 28 U.S.C. § 1391(b).  However, in order to be comprehensive, an analysis under 28 U.S.C. § 1404(a) will also be done.

The Oneida Nation and the defendants reside in this district, and the Oneida Nation's cigarette retail operations take place here.  The new law was enacted and the emergency regulation and July TSB-M were promulgated in Albany within the Northern District.  Plaintiff chose the Northern District, a choice that will be given deference because the operative facts have significant connection to this district.  The convenience of the parties and the witnesses, as well as easy access to sources of proof, weigh in favor of maintaining the action here.  There are no practical problems that would weigh against maintaining the action here.  Defendants make no argument to the contrary.  They argue only that strong policy considerations favor litigating related cases in the same tribunal to promote judicial efficiency, making transfer to the Western District desirable.

According to defendants, a two-day evidentiary hearing on the preliminary injunction motion in the Seneca & Cayuga cases has already been held in the Western District, the arguments in which overlap those made here.  Accordingly, according to defendants, transferring venue to the Western District would conserve judicial resources, while maintaining venue here would waste judicial resources.  However, although tribal sovereignty and the need to provide tax-free cigarettes for sale to members are at issue both here and in the Seneca & Cayuga cases, the factual background and legal issues are fundamentally different.

In the Seneca & Cayuga cases the majority of the cigarette retailers are privately owned, not operated by the tribes.  In this case, the Oneida Nation owns and operates the retail outlets.  Major issues in the Seneca & Cayuga cases are that the tribes have a significant governmental interest in successfully regulating the cigarette retailers; the revenue from their own stamping fee provides essential services to members; and their retailers' internet, telephone, interstate, and mail order sales, which make up a substantial part of the market, are not adequately addressed by the new law.  In fact, the Unkechauge Indian Nation argues that the tribe's only revenue is derived from its tax on cigarette sales. None of these issues are involved with this case.  Moreover, the Oneida Nation claims that the new law unlawfully imposes a significant burden upon it by requiring prepayment of the tax, a claim not made in the other cases.  The Oneida Nation has requested directed mediation which has not been requested by any of the tribes in the other cases.

Additionally, although an evidentiary hearing was held in the Seneca & Cayuga cases, the parties in this action agreed that the preliminary injunction motion could be determined on the law without taking evidence.  However, the Oneida Nation, not a party to the Seneca & Cayuga cases, did not have notice and an opportunity to be heard at the evidentiary hearing in the Western District, clearly implicating its due process rights.  If this case were transferred to the Western District an additional proceeding would be required in order to permit the Oneida Nation to present arguments on its claims, divergent from those of the other tribes, and in order to provide the Oneida Nation the process it is due under the Constitution.

While on its face it appears that it would promote judicial efficiency to transfer and consolidate all of the cases challenging the new law, upon closer examination it becomes

apparent that there would be minimal if any economies that would result from transfer.

Having the St. Regis case transferred to the Western District does not affect the analysis,

because it would be inappropriate to consolidate the Oneida Nation and the St. Regis cases.

Actions may be consolidated if they involve a common question of law or fact.

Fed. R. Civ. P. 42(a).  Whether to consolidate cases is within the broad discretion of the

court, taking into consideration concerns of efficiency balanced against the possibility of

confusion and prejudice.  Kelly v. Kelly, 911 F. Supp. 66, 69 (N.D.N.Y. 1996).  The moving

party has the burden of establishing that efficiency to be gained by consolidation outweighs

potential delay or prejudice.  Transeastern Shipping Corp. v. Indian Supply Mission, 53

F.R.D. 204, 206 (S.D.N.Y. 1971).

Defendants argue that both the St. Regis case and this action involve common

questions of law and fact.  While, as defendants point out both actions challenging the new

tax law involve tribal sovereignty and providing tax-exempt cigarettes to members, there are

many more differences.  Factually, the St. Regis Mohawk tribe has highly regulated the

cigarette retail outlets operating on its reservations.  It requires minimum pricing, and retailers

must affix a tribal tobacco fee stamp that they purchase from the tribe.  The revenue

generated by the tobacco fee helps the tribe operate its law enforcement, compliance,

sanitation, fire department, education, health, and environmental services.  In contrast, the

Oneida Nation itself operates its retail outlets, and there is no issue about any tax stamp-type

fee or depriving the Oneida Nation of essential services due to decreased revenue from

cigarette sales.

As to the law, the St. Regis Mohawks challenge the coupon scheme, arguing that it

would require an elaborate allocation regulation by the tribe, and that a referendum would be

required to even elect to participate in the coupon scheme.  No such arguments are made by the Oneida Nation.  The St. Regis Mohawks challenge the prior approval system arguing mainly that the system could be manipulated by retailers by reselling cigarettes on reservations that have a lower quota.  In contrast, the Oneida Nation's argument regarding the quota system pertains mainly to the potential manipulation by wholesalers.  Claims in the St. Regis case include a violation of self-government claim of coercion to adopt the coupon system, and a supplemental state law claim alleging violation of state law with regard to the coupon scheme.  No such claims were brought by the Oneida Nation.  The St. Regis Mohawks seek injunctive and declaratory relief as to all New York tribes.  The Oneida Nation seeks relief only as to itself.  Contrary to defendants' assertion, there is not a significant overlap in the law and facts of the two cases.

Finally, in this case the Oneida Nation has sought directed mediation, which has not been requested in the St. Regis case.  Moreover, none of the parties in the Seneca & Cayuga cases have requested court-approved mediation.  Thus, should mediation be granted, the procedural posture of the this case and those currently in the Western District would be wholly different.

Given the differences in the law and facts just recited, most of the papers the parties submit would not be duplicative.  Further, oral arguments would be minimally duplicative, and the potential for the need to present witnesses multiple times is not great.  Given the lack of similarity in the factual circumstances of the cases and the fundamental difference in the claims presented, there is significant risk of confusion and prejudice.  There is also potential for a divergent procedural posture that could result in delay in either case.  Defendants have not met their burden of establishing that potential gained efficiencies

outweigh possible delay and prejudice.  Thus, it would be improper to consolidate this case

with the St. Regis case, and nothing would be gained by transfer to the Western District.

Venue is not proper in the Western District.  Even if venue were proper there,

defendants have not established that for the convenience of parties and witnesses, and in

the interest of justice, venue should be transferred.  Moreover, there is a substantial

connection between the operative facts of this case and the Northern District, and virtually no

connection with the Western District.  Therefore, deference must be given to the Oneida

Nation's choice of forum--the Northern District of New York.  It would be inappropriate to

consolidate this action with the St. Regis case; therefore, transfer of the St. Regis case to the

Western District does not affect the result that defendants failed to meet their burden of

establishing that transfer is appropriate.  Thus, the case will not be transferred.

### B.  Preliminary Injunction

#### 1.  Standard

A party must establish irreparable harm and a likelihood of success on the merits to

be entitled to an injunction enjoining the application of a government regulation.  Grand River

Enterprise Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam).  Further,

the movant must establish that "the balance of equities tip[] in [its] favor, and that an

injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., __ U.S. __, 129

S. Ct. 365, 374 (2008).

#### 2.  Irreparable Harm

An Indian tribe suffers irreparable harm where a state statute or rule "create[s] the

'prospect of significant interference with [tribal] self-government.'"  Prairie Band of

Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting Seneca-Cayuga

Tribe of Okla. v. Oklahoma, 874 F.2d 709, 716 (10th Cir. 1989)).  Further, when harm cannot

be compensated for in money damages, irreparable harm is established.  Id. at 1251.

"[H]arm to tribal self-government [is] not easily subject to valuation" for which monetary

compensation can obtained, therefore such harm is irreparable.  See id.  This is

compounded when a tribe may be barred by sovereign immunity from recovering money

damages from a state.  Id.

The new law requires all wholesalers to purchase and affix tax stamps on every

pack of cigarettes they sell.  The wholesaler then passes on the cost of the tax to the

purchaser, in this case the Oneida Nation.  This scheme in effect requires the Oneida Nation

to pay the tax, and be out-of-pocket for that amount until the retail sale is made.  Taxing the

plaintiff in this manner is unconstitutional.  See Attea, 512 U.S. at 64, 114 S. Ct. at 2030.

According to the plaintiff, in order to maintain an adequate level of inventory to

continue its non-member retail business it would be required to pay out almost $3.5 million.

Requiring the Oneida Nation to, in effect, pay the tax out of tribal funds impinges upon the

Oneida Nation's tribal sovereignty because, as a sovereign nation, it is not subject to taxation

by the state.  Further, requiring the Oneida Nation to pay out such a large amount of money

impinges upon its ability to operate its business, a fundamental part of sovereignty and self-

governance.

The defendants argue that it is the wholesaler that has paid the tax, and what the

plaintiff will be required to pay is merely the increased cost of cigarettes due to the tax.

However, where there is an untaxable entity such as an Indian tribe in the distribution chain,

the transaction is not taxable prior to the point of sale.  See Washington v. Confederated

Tribes of Colville Indian Reservation, 447 U.S. 134, 143 n.9, 100 S. Ct. 2069, 2075 n.9

(1980) (accepting that "the first taxable event is the use, consumption, or possession by the non-Indian purchaser," rather than at some point earlier in the chain of distribution, because the tribe or its members could not be constitutionally subjected to such tax).

These impingements upon the Oneida Nation's tribal sovereignty, self-government, and constitutional rights, cannot be compensated for in money damages.  Moreover, even if the impingements could be valued at some monetary amount, plaintiff cannot bring an action against the State to recoup monetary damages it suffers.  Thus, the harm from permitting the State to enforce its new tax law will be irreparable to the Oneida Nation.

### 3.  Likelihood of Success on the Merits

A state may only impose upon a tribe a "minimal burdens reasonably tailored to the collection of valid taxes from non-Indians."  Attea, 512 U.S. at 73, 114 S. Ct. at 2036. Plaintiff can establish a likelihood it will be successful on the merits by establishing that New York's new tax scheme will impose more than minimal burdens upon it and that the burden upon it is not reasonably tailored.

In order to obtain cigarette inventory to continue its established retail business, the Oneida Nation will be required to pay the tax on approximately 80,000 cartons, amounting to about $3.5 million.  Paying the tax through the wholesaler to the State does not alter the fact that the plaintiff must pay out $3.5 million in order to continue its retail cigarette business. Further, even after the initial outlay is indemnified through retail sales to non-members, the $3.5 million will continue to be an amount outstanding to maintain necessary inventory levels.

Continuing to fund the $3.5 million outlay from the tribe required under the new law to continue its business will cost the Oneida Nation at least $208,000 per year, every year. Further, as the State continues to increase the amount of the tax, the cost to carry the

inventory, as well as the continuing price of financing that cost, will rise.  It cannot be said that $3.5 million or more imposes only a minimal burden upon the Oneida Nation.

Further, the prior approval scheme does not assure adequate availability of untaxed cigarettes for consumption by members and the Oneida Nation.  The new law contained no provision for how a wholesaler would obtain prior approval, how the tax division will provide such approval, or how wholesalers request and receive refunds of the purchase price of the tax stamp.  Although the regulations and July TSB-M provide that a tribe's allotment meeting the amount of probable demand will be posted to the website at the beginning of each quarter, there is no provision that would prevent a wholesaler from claiming all of that allotment without a sale to the plaintiff, thereby preventing the Oneida Nation from obtaining tax-free cigarettes for its and its members use.

Such a system is ripe for manipulation by wholesalers, and actually incentivizes wholesalers to claim the Oneida Nation's allotments in order to leverage for a higher sales price to the plaintiff.  It also would allow a wholesaler, especially one who sells mostly or completely to non-Indian retailers, to monopolize the Oneida Nation's allotment to prevent tax-free sales forcing members to purchase taxed cigarettes at non-Indian retailers for their own consumption.   It has no mechanism to prevent similar monopolization of the plaintiff's allotment fueled by anti-Indian sentiments.

Defendants contend that the requirement for wholesalers who have claimed a tribe's allotment to verify a sale to the tribe within 48 hours will prevent any manipulation or monopolization.  However, even if a wholesaler does not verify a sale within 48 hours to the tribe whose untaxed cigarettes it has claimed, nothing prevents that wholesaler from immediately re-claiming that tribe's allotment immediately upon expiration of the 48 hours.

Therefore, this argument does not negate the Oneida Nation's showing of a substantial burden imposed upon it by threatening its right to obtain tax-free cigarettes.

The new law not only imposes a significant financial burden upon the Oneida Nation, it further burdens plaintiff by not protecting the right to have available tax-free cigarettes for members and itself, as required by law.   The Oneida Nation has established that the new law imposes more than a minimal burden upon it.

In addition, plaintiff points to section 471-a of the New York Tax Law to establish that the new law is not reasonably necessary to enforce payment of the State cigarette tax. Section 471-a imposes a cigarette use tax[5] and requires the user to remit the tax to the State within twenty-four hours of when liability for the tax accrued.  N.Y. Tax Law § 471-a (McKinney Supp. 2010).  Thus, New York already has a valid law providing for payment of cigarette taxes by non-member on-reservation cigarette purchasers.  Given that this law is already in effect and could be enforced by the State, the new law is unnecessary.  See Colville, 447 U.S. at 150-51, 100 S. Ct. at 2080 (explaining that the legal incidence of the tax at issue in Moe was upon the purchaser, who may be "'willing to flout his legal obligation to pay the tax'" (quoting Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 482, 96 S. Ct. 1634, 1645 (1976))).

The significant burdens imposed upon the Oneida Nation by the new law, including violation of its right to be free from taxation by the State, are not reasonably necessary to collect the cigarette tax.  Therefore, plaintiff has established a likelihood of success on the merits.

---

[5]  Exemptions are provided from the use tax when the tax is paid at the retail level, if the use is otherwise tax exempt, and on a limited number if cigarettes brought into New York from elsewhere.  Id.

Defendants argue that Attea and its precursors Colville and Moe compel a finding that the new law does not impose an undue burden upon plaintiff.

To the extent relevant here, at issue in Colville was a cigarette excise tax of $1.60 per carton, which the challenged Washington state law required retailers, including tribal retailers, to collect.  Colville, 447 U.S. at 141, 100 S. Ct. at 2075.  The Colville Court explained that under Moe minimal burdens (i.e., collection and recordkeeping) could be imposed upon tribal member retailers in order to collect a state tax on sales to non-members.  Id. at 151, 100 S. Ct. at 2080 (citing Moe, 425 U.S. at 482, 96 S. Ct. at 1645).   Under New York's new law the Oneida Nation would be required to pay the tax of $43.50 per carton, rather than just collect the tax and keep records of it as was the case in Moe.  Id.

In Colville, the Court found that the tribe's imposition of its own tax on cigarette sales, exercising its power to self-govern, did not pre-empt the imposition of a tax on cigarette sales to non-members imposed by the state nor require the state to give credit for the tribal tax.  Id. at 156-59, 100 S. Ct. at 2081-84.  The Court further found that the state did not impinge upon the tribe's right to self-government by taxing sales to non-members, because the taxes were imposed upon non-members.  Id. at 161, 100 S. Ct. at 2085.  Finally, the Court found that the state's off-reservation seizure of unstamped cigarettes was justified by its interest in enforcing collection of the taxes, because the tribe refused to collect and remit the taxes.  Id. at 161-62, 100 S. Ct. at 2085.

Thus, neither Colville nor Moe involved a state tax scheme that required a tribe to pre-pay taxes on cigarettes sold to non-members.  As the Court stated in Moe, "the State may require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's collection and enforcement thereof."  Moe, 425 U.S. at 483, 96 S. Ct. at 1646.  In

contrast, here New York purports to require the Oneida Nation to pre-pay approximately $3.5 million in taxes.  Moreover, assuring adequate availability of non-taxed cigarettes for members and an alternative collection method for sales to non-members are at issue here but were not raised or at issue in <u>Moe</u> or <u>Colville</u>.  Therefore, these cases do not dilute likelihood of success on the merits established by plaintiff.

### 4.  <u>Balance of Equities and Public Interest</u>

The Oneida Nation has a very strong interest in retaining its sovereignty and rights of self-governance.  <u>See</u> <u>White Mountain Apache Tribe v. Bracker</u>, 448 U.S. 136, 143, 100 S. Ct. 2578, 2583 (1980).  The federal government also has a strong interest in "promoting tribal self-sufficiency and economic development" of the plaintiff.  <u>See id</u>., 100 S. Ct. at 2583-84. New York's interest in regulating tribal conduct on a reservation is minimal, while its interest in regulating non-members' conduct on-reservation is stronger.  <u>See id</u>. at 144, 100 S. Ct. at 2584.  Although New York may have an interest in obtaining revenue, injunctive relief will maintain the status quo, not reduce the State's revenue.  In addition, the Oneida Nation would suffer irreparable harm should an injunction not issue, tipping the scales of equity in its favor.  Thus, in balancing the equities, the Oneida Nation's interests prevail.

It is also in the public interest to protect the Oneida Nation's sovereignty and rights of self-governance, and prevent any potential violation of federal law.  According to defendants it is contrary to the public interest to allow non-members to violate the law by purchasing untaxed cigarettes on the reservation.  However, the State's policy of forbearance--not enforcing collection of tax on such sales--was its own choice and has been in effect for many years despite valid laws requiring such collection.  The State has been

depriving itself of these revenues for many years and cannot now use revenues as a "public interest weapon" to prevent injunctive relief where it is otherwise deserved.[6]

The Oneida Nation has established that irreparable harm will ensue if an injunction is not issued, demonstrated a likelihood of success on the merits, and shown the balance of equities and public interest in its favor.  Therefore, it is entitled to injunctive relief.

### C. Mediation

Any civil action may be referred to mediation by referral order, on motion of a party, or on the parties' consent.  Mediation is a method by which parties can work to resolve a case at an early stage.

Prior to the effective date of the new law the parties were negotiating to reach a resolution without resort to litigation.  Defendants assert that they are open to continuing negotiations with the goal of reaching a mutually agreeable resolution.  However, defendants contend the settlement discussions are political in nature therefore not appropriately conducted through court-ordered mediation.

The issues confronting the parties are now in litigation, making it an appropriate case for court-ordered mediation.  Lengthy litigation would delay a resolution and be costly for all parties.  The earliest possible resolution of the issues, saving the parties both time and expense, could be achieved through mediation.

The political nature of the dispute and its resolution is no impediment to court-ordered mediation because such mediation was contemplated by the State Legislature and

---

[6]  Defendants also argue that enjoining implementation of the new law will undermine the State's public health initiatives.  However, the stated purpose of the legislation is to raise revenue.  Public health is not mentioned.  Moreover, the goals of raising revenue and assuring the public health by reducing cigarette use are contradictory, for if less cigarettes are used by the public fewer taxes will be paid and tax revenue will be lower.

the Governor.  The Legislature added section 471(6) with the new law.  It provides the

following:

> Tax agreements with Indian nations or tribes.  If an Indian nation or tribe
> enters into an agreement with the state and the legislature approves such
> agreement or if an Indian nation or tribe enters into an agreement with the
> state that is part of a stipulation and order approved by a federal court of
> competent jurisdiction regarding the sale and distribution of cigarettes on
> the nation's or tribe's qualified reservation, the terms of such agreement
> shall take precedence over the provisions of this article and exempt sales
> to non-members of the tribe or nation and non-Indians by such nation
> from such taxes to the extent that such taxes are specifically referred to in
> the agreement, and the sale or distribution, including transportation, of
> any cigarettes to the nation's or tribe's qualified reservation shall
> be in accordance with the provisions of such agreement.

Carmen Aff. Ex. 4, Doc. No. 12-4 (emphasis added).  Significantly, the Legislature just added

this Federal Court approval provision with passage of the new law.  The plain reading of this

provision is that if a tribe and the State reach a settlement that is approved by a Federal

Court, the terms of that tax agreement, rather than provisions of the new law, control with

regard to both member and non-member on-reservation purchases of cigarettes.

Defendants argue that this provision cannot be read to mean that collection of the

tax under the new law would be enjoined while the parties negotiated or mediated a tax

agreement.  To the extent defendants argument concerns injunctive relief, it is accurate that

section 471(6) does not address it.  However, the question of entitlement to injunctive relief is

a separate question, answered in the affirmative above, unrelated to the question of the

propriety of court-ordered mediation.

In light of the plain meaning of the section 471(6) that any negotiated, court-

approved tax agreement between the parties would control, an injunction precluding the state

enforcement of the new law while the issues are in mediation and negotiation is clearly

- 22 -

advisable.  It would be counterproductive to enforce the new law while mediating and negotiating a possible tax agreement that would replace the new law in whole or in part.

In passing and signing section 471(6) the State Legislature and the Governor prognosticated that a settlement would be reached between the State and the Indian tribes with terms different than those contained in the new law.  The fact that the parties have been negotiating extensively for months prior to the September 1, 2010, effective date of the new law only confirms that fact.  Additionally, the State Legislature and the Governor contemplated that the Federal Courts would play an important role in any negotiated tax agreement.  Therefore, this is a very appropriate case for court-ordered mediation.

## IV.  CONCLUSION

Venue is not proper in the Western District.  Moreover, even if venue were proper there, defendants have failed to meet their burden of establishing that the action should be transferred.  Transfer of the St. Regis case to the Western District does not affect this analysis because consolidation with that case would not be appropriate.  Venue will not be transferred.

The Oneida Nation has established irreparable harm will occur absent injunctive relief, there is a likelihood of success on the merits, and the balance of the equities tips in its favor and an injunction is in the public interest.  A preliminary injunction will issue.

Plaintiff seeks court-ordered mediation.  Defendants assert a willingness to continue negotiations initiated prior to the effective date of the new law.  In specifically

enlisting the assistance of the Federal Courts, the State Legislature and the Governor contemplated that court-ordered mediation would be used to settle disputes regarding the new law.  The parties will be ordered to enter into mediation.

Accordingly, it is

ORDERED that

1.  Defendants' motion to transfer or consolidate is DENIED;

2.  Plaintiff's motion for a preliminary injunction is GRANTED;

3.  Plaintiff's motion for court-ordered mediation is GRANTED;

4.  Defendants, their agents, servants, employees, and attorneys, as well as all other persons who are in active concert or participation with any of the foregoing persons, are PRELIMINARILY ENJOINED and PROHIBITED as against the Oneida Nation of New York, or against any wholesalers, suppliers, stamping agents or others providing to the Oneida Nation cigarettes that do not bear a State of New York tax stamp, from enforcing the State of New York's cigarette taxing statutes and regulations, including Tax Law §§ 471 & 471-e (as amended) and the Department of Taxation and Finance's emergency regulations issued June 22, 2010, and published in the New York State Register on July 7, 2010, and readopted on September 13, 2010; and from restricting in any manner, with respect to the Oneida Nation and wholesalers, suppliers, and stamping agents who supply the Oneida Nation, the Oneida Nation's purchase, acquisition, sale, distribution, transportation, or possession of cigarettes not bearing a New York tax stamp; and

        5.  This action is referred to Hon. Andrew T. Baxter, United States Magistrate

Judge, for mediation to conclude no later than December 17, 2010.  The parties are directed

to comply with all orders and directives of the Magistrate Judge.

        IT IS SO ORDERED.


                                                    _____
                                                    United States District Judge


Dated: October 14, 2010
          Utica, New York.